May it please the Court, Sean O'Keefe appearing on behalf of the appellants. I would like to reserve three minutes, to the extent possible, for rebuttal. I would emphasize the following points in my brief. The first point is due process. This is a case where my clients met with the government beforehand when they knew this investigation was going. They voluntarily flew to Washington and met with the government for two hours, explained their business model, explained exactly what they did, and in essence invited the government to the extent they had a problem with anything they were doing to advise them of that, and the government elected not to do so. The government then filed a lawsuit against Morgan Drexen, which was a service provider and its principal alone. Notably, in the complaint that Morgan Drexen, that the government filed, Paragraph 8, which is 166 of the ERs, they acknowledged that the contracts were between the appellants and their clients. They acknowledged that the payments came from the appellants' clients to the appellants. They acknowledged that the appellants paid Morgan Drexen for services rendered, yet my clients were not named as a party. During the... But the payments... I was wondering if you... I understand this. The payments were made to your clients. Yes. And they then paid Morgan, whatever it is. And they paid them, I think, like 85% of what they got? No, Your Honor. In fact, see, that's a fact purported, which was in the underlying case, which was a function of a default finding. In fact, each contractual relationship was different. There was roughly 8,000 people involved in contractual relationships because this was a network of attorneys, roughly 70 different law firms. So depending upon the relationship, for example, if my clients, the attorneys, had to prepare answers, respond to discovery, and otherwise were heavily involved in a case, ultimately the services provided by Morgan Drexen would be far less. Alternatively, if it was a case, for example, in the data collection process, because that's primarily what Morgan Drexen did, they were struggling with the client, and on an hourly basis they had to spend more, which is not infrequently the case in the consumer debtor case, then Morgan Drexen would get more. But it was done on an hourly basis. There was no sharing whatsoever. In fact, that's a violation of the professional ethics code. So there was nothing to that effect. And the contracts in evidence make that crystal clear. That 85% was a default finding in a hearing that my client had nothing to do with. So that shouldn't even be considered. The only evidence is what I introduced at the contempt hearing, which is the contracts. And if you read their complaint, which again, they did not name my client, they acknowledge that it was my client who had the client relationship with these individuals. So there's no evidence in the hearing as to whether your client gave the Morgan company 85% or 5%? No evidence whatsoever in the contempt hearing. In the other proceedings? As to what percentage went to them and what percentage your client retained? Your Honor, that would depend upon the client relationship. My client never took an audit of 8,000 people to see what the blended allocation was of dollars coming in and out. I'm just talking about your client. There's no evidence about what percentage of the fee your client got was passed on and what percentage you retained, your client retained. Your Honor, no evidence whatsoever in the contempt hearing, which is the only hearing my client participated in. In the underlying case, those were all default findings. I am not aware of any audit that was conducted of 8,000 people that assessed who received what over a period of five years. That would have taken months and hundreds of thousands of dollars. What the government then did is, when one of this network endeavored to intervene, saying, wait a minute, that's my client you're talking about. The government said, no, I'm going to keep you out because this lawsuit has nothing to do with you. You will not be affected. And the district court adopted that. Thereafter, there was a default judgment against Morgan-Drexen in letter, giving the government everything it wanted. A month later, I went to a hearing for the limited purpose of getting my client's files from Morgan-Drexen's cloud. And at that hearing, with no notice, no discussion, the district court wrote an opinion saying, by the way, I think your clients may be subject to this, and I'm not going to tell you what they're subject to, but it's the majority, and I'm not going to define the majority. Given this procedural boon, and if you read the government's pleading, they had no concept that the government was going to grant, that the district court was going to grant that relief. In fact, they said I had no right to appear whatsoever because I was a non-party. They acknowledged that I had nothing to do and my clients had nothing to do with the case. Given this procedural boon, they then said, great, we had no ability to regulate you, we did not serve you, we did not name you, yet we have a judgment that you've just been to seek contempt, non-proton, to the date the order was entered. And that's exactly what happened. Why were the terminating sanctions entered? The terminating sanctions were entered, and again, we weren't involved in this. But why? What was the basis for that, for the entry of the default? According to the record, the Morgan-Drexen, when it was confronted with the issue of did you prepare the bankruptcy petitions, apparently they did not prepare a number of them and allegedly went into the system and began to print these out. And that was a discovery fraud and that was the basis for all of the findings. So it created sham bankruptcy applications? Your Honor, in truth, when I looked at that record, it reflected that that was the finding. That was the finding, Your Honor. But I will tell you that it reflected a fundamental lack of understanding of both the system that generates those petitions and how the practice works. Now, whether that, in fact, occurred, I have no idea because I was not involved in that hearing. So at the end of the day, my clients were not named, they were not served, it was a Now, after all of this occurred, if you read the continuance of the, the continuum of the briefs, you'll see that the government was effectively saying, we had a problem here. The way the district court applied 65D2 was clear error. The district court said, you're legally identified with Morgan-Drexen because of actions you took after the injunction was entered, which is mixing apples and orange. Legal identification requires a close relationship, very close relationship, as the Seventh Circuit noted in the Baha'i case, pre-injunction. And as this court has noted in the Headwaters case, and as the Supreme Court has noted repeatedly in Taylor, you have to have had participated in the action, or controlled the person who was participating, such that you had your day in court. And that's the, that's the missing element that the district court erred on, and that's the due process issue. On the other side of it, you're acting in concert, due process is also woven into that rule. In essence, the rule says, if the enjoined party, who has already had their day in court, uses you as an instrumentality, and you are aware of that, you will be deemed in contempt. But the predicate is always the enjoined party. The enjoined party has violated the injunction, and you cannot have contempt unless you have contempt against the enjoined party. The enjoined party was shut down on the day the injunction was entered, and six months prior to that, it was under the control of a Chapter 7 trustee. There was no suggestion that there was any aiding or abetting for cooperative activity whatsoever. It was an impossibility. So what they did is said, okay, we have a problem. We need a legal justification for what occurred, and that was the successor doctrine. And the best response to that is the following, which appears in the GNC-Miriam case, which is the First Circuit decision. In that case, the First Circuit said, counsel, you have not provided us a single case, and we have not been able to find one that allows the successor doctrine to be applied except in a circumstance where the underlying business is acquired. My clients never acquired this business. On the day they met with the government, on the day the lawsuit was filed, and on the day that injunction was entered, they were providing the same legal services to the same clients pursuant to the same contracts. Okay. So what the district court here found, though, was that your clients were a disguised continuance of Morgan Drexen, and that's why successor liability applied. Now, how is that clearly erroneous, that finding? It's clearly erroneous in the following respect. First, the government acknowledges in their own complaint, which we were never served or no relief was sought against us, that it was our contract. We had a legal retainer agreement with 8,000 people. They acknowledge that we received the money. It's simply their contention that we're going to say that this relationship is not what the contract says, but it's something else. Otherwise, what happened was my clients, prior to the filing of the lawsuit, were providing legal services which they were required to provide, both as a matter of contract and as a matter of ethics to those people. So on the day it was filed, they were providing those legal services and being paid exactly what they were entitled to. During the case, they were doing that, and after that case, nothing changed. Nothing changed other than the deprivation of a service provider. That's not a disguised continuance. They're continuing their own business. Now, the contract you signed with your clients, did it say anything other than bankruptcy? Did it talk about what Morgan was doing? No. There were two clients. There were two contracts, one with each client, which provided for a suite of legal services, which every consumer debt firm in the country provides. It's a range from workouts to filing bankruptcies. And then there was a separate contract with Morgan Drexen, and Morgan Drexen simply outsourced all your paralegals, your trust accounting, essentially all the work that an attorney would not want to do. There's one attorney in my law firm. Everything else is outsourced. If the government shut down my research, filing, copy, paralegal service, all of which is outsourced, that doesn't mean that they shut down my business. I would simply have to hire more people. I just don't understand this. So your client comes in and he signs two contracts when he comes in? Yes. There's one contract. With you and one with Morgan? There's one contract with each client, a legal services contract. Then there is an entirely separate contract with Morgan Drexen, pursuant to which Morgan Drexen agrees to provide a suite of services to my client. Paralegal services, trust accounting services, copy services. And you collect on both of those? No. We receive money from the client. It's deposited in the trust, our trust account. We then draw on that to pay the attorneys for their time. Then if Morgan Drexen sends us a bill as to that particular client says I spent three hours providing paralegal services, they get cut a check. It is never the same check as to each person. It's always different. So it was a service provider. There was no disguise continuance. In their own complaint, they acknowledged that it was our contract. The disguise continuance in the successor doctrine was designed to prevent a circumstance where someone acquired the business or, as the GNC Miriam Court, the First Circuit said, disguise continuance really only operates in an instrumentality context, as in where the enjoined party, having had their day in court, goes out and essentially does an end run around the injunction and begins to do exactly what they were enjoined from doing. That's not this case. My clients simply had nothing to do with this. They continued to do, throughout this continuum, what they were doing before. So the district court relied heavily on the Letta deposition where Letta testified that your client told him that he was going to continue the same business without Morgan Drexen and took over a lot of the services? Your Honor, the Letta decision, that deposition transcript merely was communication between my client's principal and Mr. Letta in a parking lot where he essentially said, well, what are you going to do? And he said, I'm going to continue doing my law practice. I'm simply going to help. Well, no, I've read the deposition transcript. What I'm curious about was did you submit any evidence to the contrary of this? I mean, your basic argument, due process, is that you didn't have your day in court. Did you have a chance to submit contrary evidence that your clients did not take over the business for a long period of time? Absolutely. Absolutely, Your Honor. There's roughly, between roughly 260 and 310 of the ERs are two declarations by my client that extensively deal with it. And they confirm that they didn't cooperate in any degree with Morgan Drexen. Thereafter, they state, we merely continued our business and were paid for the services which we were contractually bound to perform. Had they failed to do that, they could be disbarred. In essence, what the district court did is fired 8,000 clients. You know, you're way over time already. You wanted to save, I think, two minutes, was that it? Yes, Your Honor. All right. Well, we'll give you your two minutes. Thank you, Your Honor. May it please the Court. Kristin Bateman for the Consumer Financial Protection Bureau. The district court did not abuse its discretion in holding these attorneys in contempt because it correctly found first that the attorneys were bound by the injunction because they had become successors to Morgan Drexen. And second, that the attorneys then proceeded to violate the injunction by charging affected consumers fees and by sending out misleading letters that directly undermined court-ordered communications to these consumers. And I can go through both of those findings. So first, the finding that the attorneys were bound as successors to Morgan Drexen. That conclusion was entirely correct. It is well-established by both this Court and the Supreme Court that successors can be bound to comply with their predecessors' legal obligations. And one example of where that happens is when an entity substantially continues an enjoined party's business operations. And that's exactly what happened here. As Morgan Drexen was winding down as a result of this... So what's your best case that this is covered by the successor rule? I would point, Your Honor, to a line of cases from this Court, such as Bates v. Pacific Maritime, the Criswell v. Delta cases, resilient floor covering. All of these cases make the point that the successor liability doctrine is fundamentally an equitable doctrine that looks to the fairness of the situation and looks to the continuity of the business operations. Well, the district court relied on legal knitwear. And that's a Supreme Court decision that says successors and assigns may be instrumentalities through which defendants seek to evade an order or may come within the description of persons in active concert participation with them. It seems as though this is suggesting, and maybe you can help me understand it, that it still has to be conduct sort of directed by the person against whom the injunction was entered. No, that's not the case, Your Honor. In following legal knitwear in Golden State bottling, the Supreme Court clarified that that's not what legal knitwear... Okay, can you point me to where the Court said that in Golden State? Sure, let me grab it. Thank you. We reject petitioner's contention. This is on page 178. At the beginning of 178. Okay. We reject petitioner's contention that legal knitwear supports the argument that Rule 65 is a bar to judicial authority to enforce board orders against bona fide successors. So in that case, the successor was someone who was wholly independent from the party who was subject to the original order, was not controlled by any of the original defendants. And the same is true in cases that in this court... Okay, but in that case, there was an order that bound the employer, its officers, successors, and his signs. So it explicitly bound successors. Is that the case in this case? The injunction in this case does not specifically mention successors, but this court has never required the order, the injunction specifically to mention successors for successor liability to attach. And the reason for that is that the successor liability doctrine is fundamentally equitable. And the idea is that if you are going to reap the benefits of taking over an enjoined party's business operations, you have to take the obligations that come along with that. The benefits come with burdens. And otherwise, successive entities could just come in and pick up exactly where the enjoined party left off and use the infrastructure that the enjoined party had established to continue carrying out the actions that the injunction prohibits. And that would nullify court's orders and prevent effective enforcement of the law. And that's exactly, these principles fully support the finding of successor liability here. What happened here was as Morgan Drexen was winding down, the attorneys saw an opportunity to step in and to continue Morgan Drexen's role in the scheme. They hired 50 to 60 Morgan Drexen employees. They took over four entire departments that performed key aspects of the business. They hired key executives. And these employees came over to the law firms and they did the same jobs as they were doing before. And then the attorneys did everything they could to ensure that they could carry on Morgan Drexen's part in the scheme, carry on business as usual, including by sending out letters to consumers that essentially said, you got these letters from a court, didn't mention they were from a court, but these court ordered letters and don't listen to them, ignore them, disregard the advice in there. Nothing is going to change. Your fees will remain the same. The automatic withdrawals from your bank account will remain the same. And then the attorneys, with the use of the trained workforce that Morgan Drexen had hired and trained, they then went on to continue Morgan Drexen's role in the scheme. And did that specifically include the prepayment of, I guess, that was what was illegal, right? The prepayment of fees? The legal conduct and the underlying, the primary legal conduct and the underlying action was collecting advance fees, prepayment of fees. The injunction barred not only continuing to collect advance fees, but also continuing to collect any fees at all from this particular group of consumers who had already been subjected to that violation. And that was fundamentally a remedial part of the injunction, recognizing that these consumers had already been charged fees for services that they likely never received and were likely never going to get back given Morgan Drexen's bankruptcy. So given that, the court's injunction said, you can't charge any further fees from these consumers. Then, when the attorneys stepped in and took on all the benefits of taking on Morgan Drexen's operations, of taking on their trained workforce, of not having to go through the trouble of figuring out how to run this part of the business themselves, how to train workers to do these parts of the operations. When they took those benefits, they became bound by the obligations under the injunction. The already existing clients that the attorneys continued to serve, they did that without any fees other than the ones they had already collected? I'm sorry, Your Honor? They didn't get any additional fees? They did. They continued to collect fees from these consumers. From the same people? From the same people. And that's what violated the injunction. Continued to collect fees? I thought those people had already paid in advance. The way the scheme worked is the Morgan Drexen and the law firms would take fees over time. So there were advance fees, and those fees were paid over a number of months. And there were also monthly maintenance fees that were also illegal. And so the fees were continuous and ongoing. And when the attorneys stepped in to continue the operations, they continued to collect those fees in violation of the injunction. They continued to collect fees that were payable to Morgan Company? In form, the fees were and always had been payable to them. Morgan Drexen had always been the one who was doing the mechanics of taking the fees out of the consumer's bank accounts and processing them and sticking some in the attorney's bank account and taking some for themselves. But once the attorneys decided to not just insource the functions that Morgan Drexen had previously been performing for them, but instead to actually insource Morgan Drexen's operations and to take advantage of the operations, the workforce, the infrastructure that Morgan Drexen had built up, they got the burdens that came along with that. And that included the obligation to comply with this injunction and not to continue to impose illegal upfront fees for services that they then never received. So how come they weren't sued in the first place? Excellent question, Your Honor. The reason the Bureau sued Morgan Drexen and not these attorneys or the other... Because these attorneys were paying Morgan Drexen. So Morgan Drexen was essentially acting on behalf of the attorneys. I don't understand. So in reality, Morgan Drexen was the driving force behind this scheme. Morgan Drexen is the one who created it in the first place. They hired and then made the deals with the attorneys? And then made the deals with the attorneys. Morgan Drexen did the advertising, recruited the consumers. And when consumers called in, Morgan Drexen decided which attorney to assign the consumer to. Morgan Drexen did all of the work of the enterprise. It did the negotiating with creditors. It did all the accounting. It did the withdrawing the fees from the bank accounts. Morgan Drexen was the driving force behind this scheme. And they were doing it not just for these attorneys but for dozens of attorneys all across the country. So rather than sue all of those over 100 different law firms, the Bureau went after the core of the problem, went after Morgan Drexen with the aim of shutting down this whole nationwide enterprise for good. Okay. And so was there any kind of transfer of assets by Morgan Drexen to the appellants? There wasn't a formal transfer of assets, but that has not been required in this Court's successorship cases. I would point, Your Honor, in particular to Bates v. Pacific Maritime. There this Court specifically said the fact that you, that a successor informally takes over the operations or steps into the shoes of a predecessor doesn't shield it from, rather than doing a formal acquisition of assets, doesn't shield it from liability. The point is that you are stepping in, taking over where that enjoined party left off, reaping the benefits of that, and that's the reason why you're going to be bound. Is there anything further? Unless the Court has any further questions, we would ask that you affirm the finding that these attorneys were in contempt. Thank you. Thank you. In a brief response to the acquisition of assets, let me read from the GNC Maritime case. Counsel had not called to our attention any case, and we have found any, in which a second business entity was held to be a successor or in privity with an enjoined previously existing business so as to subject the successor to contempt proceedings in the absence of proof that the second entity acquired the business or a relevant part of it from the first entity. It is not enough to prove that the first entity went out of existence and that the second entity entered into the enjoined type of business activity, knowing about the injunction, but without having acquired the business or a relevant part of it from the first entity. The Bates case that the counsel, that counsel had was titled Who are you just reading from? I'm just reading from GNC Maritime v. Webster Co. That's 639 F. 2nd at 29 First Circuit, 1980. Okay. The Bates case that counsel spoke of was a Title VII case at the port. In that particular case, the enjoined party agreed that they would hire a certain number of African American workers. One of the constituency closed its doors. One of the enjoined parties formed a subsidiary, bought the assets, restarted it, and then ignored the injunction, the agreed upon injunction. So it was an enjoined party who had a day in court who endeavored to get around the injunction by forming a subsidy, acquiring the assets of another enjoined party. Totally inapplicable. In this particular case, we know absolutely that nothing was acquired because it was Chapter VII, six months before the injunction was entered. So not a farthing, not a penny, nothing was acquired from that estate. What happened to the Morgan Jackson estate? It's a liquidation. So it was liquidated? It was shut down on the day the injunction was entered and it's a straight liquidation. Not a desk, not a pencil, nothing did my clients take from them. Nor were they required to take any of the contracts because they're our plans, our contracts. And so far as counsel's statement that Morgan Jackson was a driving force, that's a tribal issue of fact. That's why we have trials. We don't exclude people from litigation, make determinations, and then import them six months later and saying, now you're bound. In fact, Morgan Jackson was just the tail. They were replaceable. They were fired by my client once it was discovered that they had not performed what their duties were. We paid for those petitions. So once we discovered that they'd failed to perform, they were fired. That forced us to go out and hire a new party. The transmutation of my client and my client's clients into Morgan Jackson's clients occurred in a proceeding that we had nothing to do with. As this court stated, and as has stated repeatedly, offensive use of issue preclusion is not allowed unless the party has its day in court. We never had our day in court because they designed it that way. Does the court have any questions? We would respectfully request that you reverse the decision. I would make one note as a bankruptcy attorney of 30 years. To the extent that there is any underserved attorney constituency, it is those that they shut down. They are not served by legal aid. Those are 8,000 people who they were enraged at the letters by because they all tried to stay in the employment relationship. And the day they were shut down, they were left out there at the mercy of those creditors. So this was not a good result for anybody, certainly for an organization who's supposed to be in the business of protecting those people. Thank you, Your Honor. Thank you, counsel.
judges: Reinhardt, Wardlaw, Owens